1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, as RECEIVER of WASHINGTON MUTUAL BANK, | ) ) ) | NO. _____ |
| Plaintiff, | ) ) ) | COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY |
| v. | ) ) | DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF |
| KERRY K. KILLINGER, STEPHEN J. ROTELLA, DAVID C. SCHNEIDER, LINDA C. KILLINGER, and ESTHER T. ROTELLA, | ) ) ) ) | JURY DEMANDED |
| Defendants. | ) ) ) ) | |

**COMPLAINT**

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1

# TABLE OF CONTENTS

2

Page

3

COMPLAINT ................................................................................................. 1

4

INTRODUCTION ............................................................................................ 1

5

THE PARTIES ............................................................................................... 6

6

7

JURISDICTION AND VENUE ......................................................................... 7

8

FACTUAL BACKGROUND ............................................................................. 7

9

I.     Defendants Pursue the Higher Risk Lending Strategy Despite Warnings from

10     Risk Managers and Awareness of the "Housing Bubble." ............................................ 7

11          A.     2004:  Killinger Launches a Five-Year Strategic Plan to Grow the
                    Bank's Credit Risk Through Higher Risk Lending. ............................................ 7

12
             B.     2005:  WaMu's Risk Managers Warn of Dangers of the Higher Risk

13                  Lending Strategy and the Need for Robust Risk Management. ......................... 9

14          C.     2006:  Despite More Warnings and a Weakening Housing Market,
                    Defendants Continue to Ramp Up Higher Risk Lending. ................................. 15

15
             D.     2007:  Defendants Continue With Higher Risk Lending Even After the

16                  Housing Bubble Bursts. .................................................................................... 17

17          E.     2008:  Highly Concentrated in Risky SFR Lending, WaMu's Losses
                    Mount and the Bank Goes Into Receivership. .................................................. 21

18
       II.    Fixated on Growth, Defendants Caused WaMu to Take Enormous Risks

19            Without Proper Risk Management. ................................................................................. 24

20          A.     The Defendants Marginalized Risk Management. ............................................ 25

21          B.     Defendants' Growth Strategy Depended on a Risk Management
                    Infrastructure That They Knew Was Woefully Inadequate. ............................. 27

22
             C.     Defendants Failed to Follow Interagency Guidance on Option ARMs,

23                  HELOCs and Subprime Mortgage Products. ................................................... 28

24     III.   Killinger, Rotella and Schneider All Played Key Roles in the Failed Higher
              Risk Lending. ................................................................................................................. 32

25
             A.     Kerry K. Killinger ............................................................................................ 32

26          B.     Stephen J. Rotella ............................................................................................ 33

27          C.     David C. Schneider .......................................................................................... 34

28

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - i

IV.    Defendants Caused WaMu's Held-for-Investment Residential Loan Portfolio
       To Be Layered With Multiple and Excessive Risks....................................................... 35

       A.    Option ARMs/Negative Amortization. ............................................................ 35

       B.    Home Equity/High LTV Products..................................................................... 37

       C.    Subprime.......................................................................................................... 39

       D.    WaMu Layered Additional Risk Factors Into Its Already High-Risk
             Loans. .............................................................................................................. 40

V.     The Defendants' Excessive Risk Taking and Disregard for Risk Management
       Caused Enormous Losses to WaMu................................................................................. 44

CLAIMS FOR RELIEF............................................................................................................. 46

COUNT I: GROSS NEGLIGENCE........................................................................................... 46

COUNT II: ORDINARY NEGLIGENCE .................................................................................. 51

COUNT III: BREACH OF FIDUCIARY DUTY ....................................................................... 51

COUNT IV: FRAUDULENT CONVEYANCE........................................................................... 52

COUNT V: FRAUDULENT CONVEYANCE ........................................................................... 54

COUNT VI: ASSET FREEZE .................................................................................................... 55

REQUEST FOR RELIEF............................................................................................................ 57

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - ii

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual Bank ("FDIC"), for its Complaint, states as follows:

**INTRODUCTION**

1.      Chief Executive Officer Kerry K. Killinger ("Killinger"), Chief Operating Officer Stephen J. Rotella ("Rotella"), and Home Loans President David C. Schneider ("Schneider") caused Washington Mutual Bank ("WaMu" or "the Bank") to take extreme and historically unprecedented risks with WaMu's held-for-investment home loans portfolio.  They focused on short term gains to increase their own compensation, with reckless disregard for WaMu's longer term safety and soundness.  Their negligence, gross negligence and breaches of fiduciary duty caused WaMu to lose billions of dollars.  The FDIC brings this Complaint to hold these three highly paid senior executives, who were chiefly responsible for WaMu's higher risk home lending program, accountable for the resulting losses.

2.      Pursuant to a Higher Risk Lending Strategy developed by Killinger and encouraged and implemented by Killinger, Rotella and Schneider, WaMu's Home Loans Division recklessly made billions of dollars in risky single family residential ("SFR") loans, dramatically increasing the risk profile of loans in WaMu's held-for-investment ("HFI") loan portfolio.  Defendants Killinger, Rotella, and Schneider (hereinafter collectively referred to as "Defendants")[1] led WaMu on this lending spree knowing that the real estate market was in a "bubble" that could not support such a risky strategy over the long term, that WaMu did not

---

[1] Linda C. Killinger and Esther T. Rotella are named in this Complaint in connection with Counts IV, V and VI for fraudulent conveyance and injunctive relief.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTION RELIEF - 1

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

have the technology to adequately manage and evaluate the higher risks associated with the portfolio, and in the face of continuing warnings from WaMu's internal risk managers.  This relentless push for growth was exemplified by WaMu's advertising slogan, "The Power of Yes," which promised that few borrowers would be turned away.

3.      In order to achieve this level of growth in its HFI residential loan portfolio, Defendants layered multiple risks on top of otherwise inherently risky loan products such as Option ARMs, Home Equity Lines of Credit ("HELOCs"), and subprime mortgages.  Option ARMs – WaMu's "key flagship product" – enticed marginal borrowers with low teaser interest rates and modest initial mortgage payments.  But those loans often resulted in "payment shock" to the borrowers, with required monthly payments increasing so dramatically that borrowers could not afford them and owed amounts exceeding the value of their homes.  In addition, HELOCs were sold widely, creating many highly leveraged borrowers with home loans of 90 percent or more combined loan-to-value ratios.  Furthermore, subprime loans were made to one of the riskiest segments of the SFR market, borrowers with poor credit scores and bad credit histories.

4.      Pursuant to the Higher Risk Lending Strategy, WaMu layered these already risky products with additional risk factors, including stated income and stated asset loans approved with little or no documentation (so-called "liars' loans"); loans to borrowers with high debt-to-income ratios who often could not afford to repay those loans; and loans to speculators and second home buyers who had very little personally invested in the property.  WaMu not only originated these multiple risk-layered loans for its HFI portfolio, but also

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 2

*Law Offices*
K ARR   T UTTLE   C AMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

purchased similar risk-layered loans originated by third-party brokers, correspondents and conduit channels over which WaMu failed to exercise proper quality controls.

5.      Defendants knowingly pushed their Higher Risk Lending Strategy at a point in the housing cycle when prices were unsustainably high.  WaMu focused its growth in a few geographic areas – notably California and Florida – where housing prices had escalated most rapidly and were most at risk for significant decline.  Defendants thus gambled billions of dollars of WaMu's money on the prospect that the Bank somehow would manage to avoid losses on higher risk loans to high-risk borrowers in high-risk areas, despite their own awareness of the inevitable decline in the overheated housing market.

6.      Defendants took this gamble knowing that they did not even understand the odds against them. Defendants knew that the Bank had a woefully inadequate infrastructure – including technology, controls, and data quality – to support the high volume of risky loans that were contained in WaMu's HFI portfolio.  The Bank could not adequately track and analyze its loans, measure or price for its risks, or timely adjust to changes in the market.  Rotella acknowledged in testimony before the United States Senate that WaMu's "technology was antiquated," and that the Bank "was on an explosive growth path with a very weak infrastructure."  Schneider similarly admitted to WaMu's Board in June 2008 that one of his and the Bank's "misses" was "[m]arket share and growth focus at the expense of building solid infrastructure and controls."

7.      Defendants are all experienced bankers who knew that WaMu was taking extreme risks when it focused on growing its HFI residential mortgage portfolio with multi-risk layered Option ARMs, HELOCs and subprime mortgages.  They knew that the high-risk path

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 3

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

they were on demanded robust risk management, which would require their support.   They also knew that the substantial, short-term gains generated by this lending strategy would only continue if real estate prices remained inflated.   Once the "housing bubble" burst, they each knew that borrowers faced with "payment shock" likely would default in large numbers because they would no longer have an ability to refinance, and that WaMu would incur substantial losses because the collateral for the loans would no longer be sufficient to pay off the underlying loans.

8.   Defendants also knew that strong risk analysis and management was critical to managing this type of higher risk loan portfolio.   Nevertheless, just at the point when risk management was most critical, Killinger, Rotella and Schneider marginalized the risk management function in WaMu's Home Loans Division.   Repeated warnings about the risks associated with the Bank's aggressive lending practices – even those as stark as senior risk managers declaring that WaMu was "putting borrowers into homes that they simply cannot afford" – went unheeded.   As the Bank's chief risk officer told Killinger just weeks before WaMu went into receivership, the Bank's "DNA" was missing "the risk chromosome."

9.   Although Defendants repeatedly assured WaMu's Board that they were properly managing and pricing for the risks associated with the Higher Risk Lending Strategy for the residential loan portfolio, it was not true.   Defendants should not have permitted the Bank to amass its enormous HFI portfolio of multi-risk layered loans. With proper attention to risk management, Defendants could have aborted or at least tempered the Higher Risk Lending Strategy, and improved the risk management infrastructure for making and holding high risk loans.   Had they done this, WaMu would have been better prepared for the inevitable decline in

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 4

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

the housing market, and would have avoided or at least significantly mitigated the substantial losses that the Bank ultimately suffered.

10.     As the leaders of the Bank and its critical Home Loans Division, Defendants had a duty to manage risk and establish sound lending policies and practices.  Instead, their fixation on short-term profits fueled a myopic focus on growing the HFI residential mortgage portfolio, which rewarded them for the Bank's short-term gains.  During the period from January 2005 to September 2008, Defendants collectively received more than $95 million in compensation.  As the losses mounted in the Spring and Summer of 2008, Killinger and Rotella recognized the potential problems and took steps to move at least part of their wealth beyond the reach of their creditors.

11.     The net result of the Defendants' recklessness was an HFI residential loan portfolio exceeding $100 billion with product, underwriting, geographic and macro-economic risks layered one on top of the other.  When the "housing bubble" did burst, WaMu was in an extremely vulnerable position.  As a result of the Defendants' gross mismanagement, WaMu suffered billions of dollars in losses.  WaMu was closed by the Office of Thrift Supervision on September 25, 2008, and the FDIC was appointed as receiver.  As of today, WaMu is the largest bank to fail in U.S. history.

12.     Defendants should be held accountable for the losses that the Bank suffered as a result of their negligence, gross negligence, and breaches of fiduciary duty in mismanaging the risks of WaMu's HFI residential loan portfolio.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 5

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## THE PARTIES

13.     Plaintiff, Federal Deposit Insurance Corporation, brings this case in its capacity as Receiver of Washington Mutual Bank (hereinafter, "the FDIC"), pursuant to its authority granted by 12 U.S.C. § 1821.  The FDIC was appointed Receiver on September 25, 2008, following the closure of the Bank by the Office of Thrift Supervision.  The FDIC has the right to pursue all of the Bank's claims, including claims against each of the Defendants herein.

14.     Defendant Kerry K. Killinger joined WaMu in 1982 and served as its Chief Executive Officer from 1990 until September 8, 2008, when he was terminated.  He became a member of WaMu's Board of Directors in 1988 and served as Chairman of the Board from 1991 until June 30, 2008, when the Board removed him from that position.  Killinger also served as WaMu's President from 1988 through 2004, and was a member of the Executive Committee beginning in 1990.  From 2005 through 2008, Killinger received compensation of more than $65.9 million from the Bank's holding company, Washington Mutual, Inc. ("WMI"). Killinger and his wife, Defendant Linda C. Killinger, reside in Shoreline, Washington.

15.     Defendant Stephen J. Rotella joined WaMu in January 2005 as its Chief Operating Officer and President, and he remained in those positions until WaMu failed in September 2008.  He also served on WaMu's Executive Committee beginning in January 2005 and served as the acting head of the Home Loans Division from March 2005 to August 2005. From 2005 through 2008, Rotella received compensation of more than $23.4 million from WMI.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

16.     Defendant David C. Schneider joined WaMu as President of Home Loans in August 2005 and also served on the Executive Committee.  From 2005 through 2008, Schneider received compensation of more than $5.9 million from WMI.

17.     Defendant Linda C. Killinger is the wife of Kerry Killinger.  She participated with him in acts described below in Counts IV and VI involving the transfer of property.

18.     Defendant Esther T. Rotella is the wife of Stephen Rotella.  She participated with him in acts described below in Counts V and VI involving the transfer of property.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.

20.     This Court has personal jurisdiction over the Killingers, who are residents of the district in which the Court is situated, and has personal jurisdiction over each of the defendants named in this action pursuant to Revised Code of Washington § 4.28.185(1)(a), (b) and/or (c).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the FDIC's claim occurred in this district.

## FACTUAL BACKGROUND

I.      **Defendants Pursue the Higher Risk Lending Strategy Despite Warnings from Risk Managers and Awareness of the "Housing Bubble."**

    A.     **2004:  Killinger Launches a Five-Year Strategic Plan to Grow the Bank's Credit Risk Through Higher Risk Lending.**

22.     In a June 2004 Strategic Direction memorandum, Killinger presented a new five-year strategic plan by which WaMu would take on "more credit risk (with more home

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 7

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1  equity, Alt A and non-prime residential loans) over the next five years."  Killinger expressed

2  his vision to grow WaMu's assets "by at least 10% per year, reaching about $500 billion in

3  2009," and achieve an "average ROE [return on equity] of at least 18% and average EPS

4  [earnings per share] growth of at least 13%."  He also set forth an annual goal for 2005 to

5  "[i]ncrease residential mortgage portfolio (primarily option ARMs) by $25 billion."

6  

7          23.     To reach these goals, Killinger decided that WaMu would focus on mortgage

8  lending in defined geographic markets, shunning diversification in its business lines, balance

9  sheet or geographic concentration:  "over the next five years our watchwords will be 'narrow

10  and focused' rather than 'broad and diversified.'"  Killinger expected to drive double-digit

11  growth by emphasizing "consumer loans, multifamily loans, residential non-prime, and

12  adjustable rate mortgages" and increasing the "cross sell" of home equity lines to existing

13  mortgage customers.

14  

15          24.     As part of this "narrow and focused" strategy, Killinger advocated for

16  geographic concentration "in our footprint states," including California and Florida, where

17  home prices were rapidly escalating.

18  

19          25.     While proposing that WaMu take on more credit risk, Killinger nevertheless

20  advocated for less risk management: "We believe the pendulum has swung a little too far to the

21  side of risk management over the last couple of years.  It is important that we all focus on

22  growth initiatives and risk taking.  Above average creation of shareholder value requires

23  significant risk taking."

24  

25

26

27

28

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 8

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**B.     2005:  WaMu's Risk Managers Warn of Dangers of the Higher Risk Lending Strategy and the Need for Robust Risk Management.**

26.     On January 18, 2005, Killinger and Rotella (who had recently joined the Bank) attended a meeting where the first phase of WaMu's Higher Risk Lending Strategy was approved.  The plan focused on increasing consumer loans to higher risk borrowers and "subprime market share from 4% to 12%."

27.     While limits were placed on allowable delinquencies on these riskier loans (e.g., that non-performing assets be less than one percent of total assets), risk managers at this January 18, 2005, meeting warned Killinger and Rotella that these limits were in danger of being exceeded in 2006 and beyond.

28.     The risk managers further stressed the likelihood that credit losses would lag behind origination of these higher risk loans by several years.  Accordingly, these loans could produce short-term income but longer-term losses.

29.     They cautioned Killinger and Rotella that "[c]ontinuous review and pro-active credit risk management is a must.  This includes having strong portfolio surveillance procedures within business units, consistent credit policies, and ongoing procedures for management oversight and governance…."

30.     While stressing the importance of proactive credit risk management, WaMu's risk managers also noted the challenges that WaMu faced in that regard.  They warned that "a known weakness of the current method [of risk management] is lack of incorporation of payment shock" to borrowers, and noted that "we still have gaps relative to competitors in the technologies, people and processes that let them effectively measure and manage credit loss exposures."

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 9

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

31.     Only a short time thereafter, Killinger and Rotella already were busy trying to implement other layered risk SFR lending initiatives, such as interest-only loans, 100 percent mortgage/home equity combinations, and 80/20 "piggyback" second liens for subprime and prime borrowers – effectively 100 percent loan-to-value ("LTV") lending.

32.     In a February 28, 2005, memorandum to Killinger, Rotella and other members of the Executive Committee, WaMu's Chief Enterprise Risk Officer (its top risk manager) expressed his concerns:  "The ink is barely dry on the newly created and regulatory required higher risk limit, and we are already expending effort on expansion beyond that limit."  He further warned:  "My credit team and I fear that we are considering expanding our risk appetite beyond the '05 Plan at exactly the wrong point in the cycle … the market is over heated in many key areas of the country."

33.     He also warned of "payment shock" from Option ARM loans, in which borrowers initially have the option of making minimal monthly payments but later must make much larger payments:

> Our exposure to negative amortization is substantial and growing….  [I]f interest rates revert to their long term historical mean over a five year period, our Option ARM customers with 1% teaser rates could experience payment shocks of up to 72%. If for any reason rates were above average, the math is alarming.

34.     The February 28, 2005, memorandum concluded with a strong plea to pull back from the vast expanse in risk being taken on by the Home Loans Division:

> So we come down to the basic question, is this the time to expand beyond the '05 Plan and/or to expand in new higher risk product categories?  For my part, I think not.  We still need to complete EDE [the Enterprise Decision Engine automated underwriting technology], reduce policy exceptions, improve our pricing

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 10

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

models, build our sub-prime collection capability and improve our modeling capability.  We need to listen to our instincts about an over heated/speculative housing market….  And finally, we need to seriously consider the sustainability of the current housing market and what happens if for whatever reasons (inflation, falling dollar etc.) interest rates increase.

35.     In or about February or March 2005, Rotella also received a memorandum entitled "Historical Perspective Home Loans – Underwriting" from the Bank's Chief Credit Officer.  The Chief Credit Officer had prepared this document especially for Rotella.  It provided a history of WaMu's underwriting issues in Home Loans and raised concerns about loan quality and the aggressiveness of WaMu's sales force.

36.     In his memorandum to Rotella, the Chief Credit Officer pointed out that a "fundamental understanding by many [WaMu] Loan Consultants as to what constitutes an acceptable credit risk is lacking."  He also stressed that the sales force at WaMu was mainly interested in sales volume and had pushed to make loans at all costs:  "The aggressiveness of the sales team and in many cases inappropriate, rude and/or insulting behavior towards the underwriting staff is infectious and dangerous."

37.     The Chief Credit Officer's memorandum to Rotella made a plea for support:  "[W]e believe that Senior management can quickly engage in quelling the 'noise' in the sales force by educating them on the tremendous efforts that Credit Risk has made to provide tools to enable them and the organization to succeed.  Further, Executive management should be very clear about what constitutes acceptable credit characteristics for the prime SFR portfolio."

38.     His memorandum further warned Rotella about the dangers of Option ARMs and that WaMu was putting borrowers into homes that they could not afford:

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 11

> The organization is at significant risk in its Option ARM and Hybrid portfolio of payment shock created by abnormally low Start – or teaser – rates, and aggressively low underwriting rates....  It is our contention that in the upwardly sloping rate environment and expected flattening of housing appreciation, we are putting borrowers into homes that they simply cannot afford.

39.     A few months later, in or about June 2005, WaMu's Chief Credit Officer met personally with Killinger for approximately two hours and expressed some of the same concerns he had expressed in his memorandum to Rotella.  He warned that the Bank's businesses were moving so fast that the Bank could not "catch up and quantify the risk."  He also complained that Rotella was not supportive of risk management.

40.     On June 1, 2005, Killinger authored a second Strategic Direction memorandum, in which he acknowledged the most speculative "housing bubble" in decades:

> The macro factor that troubles us the most is the rapid escalation in housing prices.  We are currently experiencing the most speculative housing market we have seen in many decades.  Reports from many areas of the country confirm rampant speculation…. Whatever the exact outcome, it is highly likely that housing will not be a stimulant to the economy and could easily become a significant drag on consumer confidence and consumer spending.

41.     Killinger had raised these same concerns in a March 2005 email to WaMu's Chief Enterprise Risk Officer:  "I have never seen such a high risk housing market as market after market thinks they are unique and for whatever reason are not likely to experience price declines.  This typically signifies a bubble."

42.     Despite these expressed concerns in his June 1, 2005, Strategic Direction memorandum, Killinger again advocated for increasing the level of  WaMu's credit risk through the origination and sale of nontraditional mortgage products:  "We have accelerated the

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 12

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
**1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028**
**Telephone (206) 223-1313, Facsimile (206) 682-7100**

development of Alt-A, government and sub-prime loan products, as well as hybrid ARMs and other prime products."   Killinger also noted the "enormous opportunity to cross-sell home equity loans to mortgage customers," lauded the performance of the subprime market as a "rapidly growing segment of the mortgage industry," and praised WaMu's narrow focus "on geographies where we had a retail presence."

43.    On June 20, 2005, in his role as interim head of WaMu's Home Loans Division, Rotella similarly authored a Loans Strategy memorandum in which he stated that a primary objective was to "[g]row profitable market share by expanding product offerings into more attractive margin products such as Alt-A, Subprime, and Home Equity where the market is growing and we have lagged the competition."

44.    That same day, June 20, 2005, the Bank's Chief Enterprise Risk Officer again emphasized to Killinger and Rotella the need for continuing credit risk management in connection with the five-year plan, and stressed a number of "present day realities":

- Home prices increasing unsustainably fast
- Negative amortization and payment shock potential in our primary product,  Option ARM Adjustable Rate Mortgages
- Increasingly liberal credit terms offered in the market include:  interest-only, 100% loan-to-value, sub-prime second mortgages, higher risk loan types available even at low borrower credit quality, and
- Housing speculation by non-owner occupied buyers.

45.    Furthermore, in a July 2005 presentation, at which Killinger and Rotella were both present, the Chief Enterprise Risk Officer again warned:

The housing market in the United States continues to be overheated with double-digit price appreciation in many markets…. Washington Mutual is at risk should significant price deterioration in the California (our large geographic concentration) and/or U.S. housing market occur.... Borrowers

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

throughout the industry are purchasing homes that they may not be able to afford....

46.     Despite these multiple warnings, Rotella supported Killinger's push for growth of home equity and subprime loans, as reflected in an email that he sent to Killinger on October 15, 2005:  "[W]e need to continue to drive to grow our way past prime sfr [single family residential] being such a big part of our business and reconsider how much growth we really want in this sector … I think our focus needs to be on organic growth of home eq[uity], and subprime…."  He followed that with another email to Killinger the next day:  "I feel strongly that where we need to land is a new home loans unit that includes prime, heq [home equity], and subprime.  It is a far superior model.  These are huge cost saves, it will drive higher cross sell, will align production with capital markets ala Lehman and Countrywide and smooth earnings and be more comparable to other big players….  I feel the only question is when not if …."

47.     Defendant Schneider joined the Bank in August 2005 as its President of Home Loans. Shortly thereafter, on or about October 18, 2005, each of the Defendants attended a meeting where risk managers again warned about the potential for payment shock in the Bank's Option ARM portfolio.

48.     In a December 2005 presentation that he authored in connection with a draft regulatory guidance on nontraditional mortgage products, Rotella identified a laundry list of risk factors that WaMu faced:  "High CLTV Lending; Higher DTIs [debt-to-income ratios] – Improper analysis or utilization of low underwriting rates, vs. likely rates the borrower will experience; Low Credit Scores; Low Doc/No Doc Lending; 3rd Party Originations; … Loans

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 14

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

with large Payment Shock (Extended no amortization periods and negative amortization loans); [and] Markets with higher risk of excessive appreciation:  TX, S. FL., S. CA, Vegas."

49.     In that same December 2005 presentation, Rotella stated:  "Given the immediate reset nature of HELOCs, many borrowers are already experiencing significant payment shock due to rate moves.  Our internal sample shows an average shock to date in excess of 69%."

C.    **2006:  Despite More Warnings and a Weakening Housing Market, Defendants Continue to Ramp Up Higher Risk Lending.**

50.     On March 1, 2006, Long Beach Mortgage Corporation ("LBMC"), a wholesale subprime mortgage lender, was merged into the Bank from WaMu's holding company, WMI. On July 1, 2006, LBMC was moved into the Bank's Home Loans Division.  These transfers were part of the strategic plan to increase the Bank's credit risk by generating risky subprime loans to be held in the Bank's own portfolio.

51.     Warnings from WaMu's risk managers continued in 2006.  For example, according to an April 18, 2006 Enterprise Risk Management Report, prepared by WaMu's new Chief Enterprise Risk Officer and presented at a meeting attended by Killinger, Rotella and Schneider, WaMu's risky SFR lending had put it in a more vulnerable position than its peers:

> The combination of geographic and variable-rate mortgage product concentrations differentiate WaMu's risk exposure from that of its peers.  A severe 'twin shock' of sustained housing price decline and rising interest rates could cause a 3x increase in mortgage charge-offs.

This report also noted that the "majority of WaMu portfolio assets are subject to rate-induced payment shocks."

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 15

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

52.     In a presentation the same day, Schneider nonetheless stated that, to grow volume, he wanted to focus more on risky third party "conduit" sales of high-margin products (Option ARMs, home equity, subprime and Alt A).

53.     On June 12, 2006, Killinger released his third Strategic Direction memorandum. Killinger again noted the potential bursting of the housing bubble, and also acknowledged the weakening of the housing market and its consequences for WaMu:

> The housing market is now showing signs of slowing.   Price increases are trending down, new home activity is slowing, consumer confidence is waning and new home starts are declining.   We expect the housing market to be weak for quite some time as we unwind the speculative bubble....   A collapse in the housing market would significantly increase our credit costs.

Rather than pull back, Killinger announced in his June 12, 2006, memorandum that WaMu was continuing with the Bank's five-year plan to increase credit risk:  "Our plans for the next three years include reducing interest-rate risk and replacing that risk with greater credit risk…."  He explained his motivation:  "Wall Street appears to assign higher P/Es to companies embracing credit risk and penalizes companies with higher interest-rate and operating risks."  Killinger stated that it was "important to adjust our culture from credit-risk avoidance to intelligent credit-risk taking and pricing discipline."  At the same time, Killinger acknowledged that taking on more credit risk required the Bank to have "good underwriting and monitoring processes and controls."

54.     Notwithstanding the fact that Defendants knew or should have known that WaMu did not have "good underwriting and monitoring processes and controls," they continued to push for growth in the Bank's riskier SFR lending.

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 16

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

55.     In his June 12, 2006, Strategic Direction memorandum, Killinger stated that WaMu's goal was to "profitably grow its market share of Option ARM, home equity, sub-prime and Alt–A loans" to over 10% in each category.

56.     Similarly, in a June 19, 2006, memorandum, Schneider set forth the following strategic objective: "Attracting a higher proportion of higher-margin products such as Alt-A, Subprime, Option ARMs, and Home Equity." Schneider also touted the "[c]ontinued roll out of additional Home Equity origination capability every quarter this year through alignment with the Retail Bank."

57.     Under Defendants' leadership, WaMu continued to originate and hold for investment large volumes of Option ARM, home equity, and subprime loans with multiple layers of risk.

58.     On October 17, 2006, WaMu's Chief Enterprise Risk Officer issued a report at a meeting attended by Killinger, Rotella and Schneider, which elevated residential mortgage exposure to the top risk facing WaMu. He warned about WaMu's large "geographic concentrations and significant exposure to mortgage products with potential for payment shocks" and concluded that the "[e]xtended period of price appreciation may be at an end."

**D.     2007: Defendants Continue With Higher Risk Lending Even After the Housing Bubble Bursts.**

59.     By the end of 2006, it was reported and well-known in the industry that the subprime lending market was in turmoil and a number of subprime lenders had failed or significantly reduced their workforces. In presentations that he made during December 2006 and January 2007, Schneider detailed the failure of a number of smaller subprime lenders.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 17

60.     At the same time, non-performing loans from WaMu's subprime mortgage channel had nearly quadrupled compared to year-end 2005.

61.     In a January 2007 presentation, Schneider acknowledged that, "Long Beach delinquencies are ... above industry average," and that key drivers of first payment defaults included, "Layering of credit risk (low FICO, high CLTV); Purchase/Occupancy Issues; Fraud, including misrep of employment, inflated stated income, and straw buyers: [and] Underwriting inconsistencies."

62.     Notwithstanding these multiple problems, in a February 13, 2007 email announcing the closure of certain subprime loan fulfillment centers at WaMu, Schneider stated: "It is critical I emphasize that WaMu remains committed to the subprime business.  I believe there is continued opportunity for us to offer subprime products to our customers through all our distribution channels and drive profitable growth in this business."

63.     In keeping with his commitment to subprime lending, in the first half of 2007 Schneider asked his national subprime production manager how soon WaMu could "double" its origination of subprime loans.

64.     By the time of Killinger's fourth Strategic Direction memorandum on June 18, 2007, a housing crisis had begun in earnest.  Killinger conceded that he had implemented the Higher Risk Strategy, building massive portfolios of HFI multiple risk-layered loans, despite having himself predicted a bursting of the housing bubble:

> For the past two years, we have been predicting the bursting of the housing bubble and the likelihood of a slowing housing market.  This scenario has now turned into a reality. . . . Because housing prices became so extended, we expect the market to be soft for another couple of years.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 18

65.     Nevertheless, stating that he was "cautiously optimistic that we can meet or exceed our financial targets over the five-year period," Killinger stuck with his strategy of "emphasizing higher risk-adjusted return products such as home equity, Option ARMs, sub-prime loans and Alt A loans."

66.     In his June 2007 Strategic Direction memorandum, Killinger announced that WaMu would "[b]egin prudently growing our balance sheet once again.... To accomplish this, we will hold more of our sub-prime originations, virtually all of our home equity originations, more of our Option ARM and multi-family originations, and look for opportunities to purchase loan packages and securities."

67.     In his own Home Loans Strategic Direction memorandum, also dated June 18, 2007, Schneider too advocated for continued focus on subprime originations and other higher-risk loans:  "The subprime market has experienced a market correction, however, it is still a segment that has accounted historically for approximately 10-15% of overall originations and must be an area of focus for Home Loans to be able to meet customer needs as well as to achieve earnings targets."  Schneider also announced WaMu's intention to continue with higher risk origination channels in order to sustain volume: "Home Loans will increase product diversification and volume growth by utilizing all production channels, including the Conduit channel, to originate growth product segments (i.e., Alt A, Subprime, Option ARM, and Home Equity products)."

68.     In his June 18, 2007, Business Strategy Overview memorandum, Rotella lauded the continued cross-selling of home equity loans through WaMu's Home Loan Centers.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 19

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

69.     Defendants Killinger, Rotella and Schneider received an email on July 17, 2007, from the Senior VP of Investor Relations, stating that, "we expect the increasing trend of weaker home prices to continue in the second half of the year and anticipate higher losses especially in the home equity portfolio which is most sensitive to falling home values."

70.     After receiving this warning, Defendants caused the Home Loans group to continue to generate substantial numbers of HELOCs, layered with other risks.

71.     By the end of Summer 2007, Killinger still was looking to ramp up the risky loans in WaMu's HFI home loans portfolio.  He told the American Banker in August 2007 that WaMu's balance sheet growth would come from "non-conforming hybrid adjustable-rate mortgages, payment-option ARMs, multifamily loans, and home equity loans."  According to a September 11, 2007, Seattle Times article, Killinger told investors that despite the serious decline in the U.S. housing market, "this, frankly, may be one of the best times I've ever seen for taking on new loans into our portfolio."  Killinger said WaMu was "adding some $20 billion in loans to its books this quarter, increasing its loan portfolio by about 10 percent."

72.     By October 2007, the housing crisis was worsening and the embedded risks that WaMu had layered into its HFI portfolio were now producing the results about which risk managers had warned:  WaMu announced a 72% drop in net income from third quarter 2006. According to the Chief Financial Officer's October 16, 2007, financial report:

> The largest single cause of the decline in earnings was the increase in the loan loss provision associated with the Company's return to a strategy of deploying capital by growing its balance sheet, as credit conditions (mostly affecting assets other than credit card receivables) worsen.

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 20

73.     In an October 10, 2007, memorandum, Schneider admitted that WaMu's residential mortgage portfolio was "impacted by higher than expected loss rates, primarily due to the geographic concentration in soft housing markets, and the prevalence of subordinated lien position in the Home Equity portfolio."  But in that same memorandum, Schneider also stated, "Current mortgage market conditions have presented an opportunity to use the portfolio as a competitive advantage and add higher quality assets at attractive risk adjusted returns."

74.     Less than a week later, on or about October 16, 2007, Schneider identified second lien HELOCs with combined loan-to-value ("CLTV") ratios equal or greater than 80% as accounting for a disproportionate amount of delinquencies and charge-offs in the HFI portfolio.  But again, he emphasized "[o]pportunities to grow the Home Equity and Prime SFR portfolios by applying risk-based pricing and economic capital."

**E.     2008:  Highly Concentrated in Risky SFR Lending, WaMu's Losses Mount and the Bank Goes Into Receivership.**

75.     By early 2008, after several years of high volume SFR lending, achieved through expansion into loans layered with multiple risks, substantial portions of WaMu's held-for-investment SFR portfolio were incapable of withstanding a decline in the housing market.

76.     According to a February 25, 2008, Credit Risk Overview Report by the Bank's Chief Credit Officer, as of February 6, 2008, WaMu had the highest mortgage and home equity concentrations as a percentage of common tangible equity of any bank in the United States. WaMu's home equity loans constituted 457% of its common tangible equity and first mortgage liens constituted 910% of common tangible equity, for a total of 1,366% (compared to an industry average of 538%).

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 21

77.     In this same February 25, 2008 Credit Risk Overview Report, the Bank's Chief Credit Officer concluded that WaMu was "heavily concentrated" in "higher risk products (e.g., Option ARMs, 2nd Liens, Subprime, Low Doc)," and geography ("we're heavily exposed in highly stressed markets such as California and Florida").

78.     The Chief Enterprise Risk Officer similarly noted in an April 2008 Enterprise Risk Management Report that "WaMu is much more concentrated in portfolio-held loans than other assets when compared to its top ten competitors; WaMu's loan portfolio is twice as concentrated in real estate loans."

79.     By mid-2008, the consequences of several years of reckless risk layering in the HFI home loans portfolio had become apparent.  For example, delinquency rates in the HFI Option ARM portfolio had increased from 0.48% at December 31, 2005, to 0.90% at year end 2006, to 2.63% at December 2007, to 4.63% at June 30, 2008.  The Bank experienced similar exponential delinquency rate increases for its subprime and HELOC portfolios, with the subprime delinquency rates rising from an already high 7.39% in 2005 to 25.20% in June 2008 and the HELOC delinquency rate rising from 0.58% in 2005 to 4.00% in June 2008.

80.     Nonaccrual rates also multiplied.  Option ARM nonaccruals went from 0.38% of the portfolio at year end 2005 to 6.10% of the portfolio in June 2008; HELOC nonaccruals went from 0.17% to 2.52% over the same time period; and subprime nonaccruals went from 4.13% at year end 2005 to 18.74% of the portfolio in June 2008.

81.     The Bank's losses also mounted.  Net charge-offs for loans in WaMu's Option ARM portfolio went from $15 million for the year ended December 31, 2005, to $37 million in 2006, to $147 million in 2007, to $777 million for the first six months of 2008.    HELOC

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
**1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028**
**Telephone (206) 223-1313, Facsimile (206) 682-7100**

charge-offs, which equaled $21 million for 2005, increased to $23 million in 2006, to $424 million in 2007, and to $1.19 billion during the six months ended June 30, 2008.  Subprime charge-offs also exploded, from $47 million charge-offs in 2005, to $134 million in charge-offs in 2006, to $550 million in charge offs in 2007 and $956 million for the first six months of 2008.

82.     The losses recorded on the Bank's financial statements through its allowance for loan and lease losses also reflected the effects of the Defendants' reckless accumulation of Option ARM, HELOC, and subprime loans.   These loss provisions increased from approximately $218 million in 2006, to over $2 billion in 2007, and an additional $6 billion in the first 6 months of 2008.

83.     In his fifth (and final) Strategic Direction memorandum, dated June 16, 2008, under the heading "Lessons Learned," Killinger conceded some of his many mistakes:

> We overinvested in mortgage lending over the years, building a business that benefited during the boom years in housing.  But it added complexity and volatility and [was] oversized for our company....  The profits of our business were anchored by Option ARMs, subprime and home equity.  In hindsight, these products were expanded with too much dependence on appreciating home values and underwriting that followed secondary market guidelines.

84.     Killinger also admitted in his June 16, 2008, Strategic Memorandum that WaMu took on too much geographic and product concentration risk:

> [WaMu's] geographic concentration of loans . . . has certainly been a huge issue for WaMu with our residential loan concentration in California and Florida.  In the future . . . we must diversify our business, both on a geographic and asset type basis.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 23

85.     While Killinger conceded errors "in hindsight," in fact he and the other Defendants had been warned as early as 2005 of the serious risks of the Higher Risk Lending Strategy, including the risks of geographic and product concentrations and that the Bank was relying too heavily on appreciating home values.  They had been warned that the Bank did not have adequate infrastructure to support its high volume of higher risk lending.  They had been warned that losses from the embedded risk in their higher risk lending likely would come several years later.  And as experienced bankers, they knew or should have known of these serious risks in any event.

86.     By September 2008, the Bank had suffered billions of dollars in losses as a result of the Defendants' recklessness.

87.     On September 25, 2008, the Office of Thrift Supervision closed WaMu and appointed the FDIC as receiver.

## II.     Fixated on Growth, Defendants Caused WaMu to Take Enormous Risks Without Proper Risk Management.

88.     The layered risk and the resulting losses in its HFI home loans portfolio were directly attributable to Defendants' gross mismanagement.  WaMu embarked on its Higher Risk Lending Strategy without an adequate infrastructure to support its high volume of risky lending.  After that strategy was launched, the Defendants had the opportunity to pull it back at every step along the way.  Each of the Defendants, the Bank's top executives, was in a position to limit WaMu's high volume SFR lending and rampant loan risk layering, and advocate for careful management of risks, and each had a duty to do so.

89.     Each Defendant failed to fulfill this duty.  Instead, each was an advocate for the pursuit of loan volume at the expense of risk management.

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 24

**A.      The Defendants Marginalized Risk Management.**

90.      Defendants repeatedly were warned that robust risk management of SFR lending was especially critical in light of WaMu's sales-driven culture and the Higher Risk Lending Strategy, and that risk managers would need senior management's support to be effective.  As experienced bankers, Defendants knew or should have known this even if they had not been warned.

91.      According to many former senior risk managers at WaMu, who personally interacted with the Defendants, they not only failed to adequately provide this needed support for robust risk management of SFR lending, they were disdainful of and marginalized risk managers.

92.      Beginning in late 2005, Rotella spearheaded structural changes that diminished the authority and independence of Enterprise Risk Management ("ERM"), the central risk management group at the Bank.  Primary credit risk responsibility was placed in the profit-oriented business lines, with the business lines risk managers reporting jointly to the heads of their respective business lines and to the Chief Enterprise Risk Officer.  ERM became more of an advisory group rather than an effective watchdog over the Home Loans Division, and there was no truly independent risk management group with authority to manage the risks of SFR lending.

93.      In approximately August 2005, Defendants hired a Chief Risk Officer for the Home Loans Division, with little background in risk management and none at a Bank.  Schneider had worked with her at a different bank and recruited her to join WaMu.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 25

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Notwithstanding her role as a risk manager, her compensation was dependent, in part, on the volume and growth of the home loans generated.

94.     After ERM became an "advisory" group, its members attempted to impose restraints on WaMu's SFR lending, with little success.   Meetings were held but no actions taken.   Proposals were made and ignored.   They were not given a meaningful voice and in many cases treated with disdain.   Both Killinger and Rotella were heard to deride risk managers as "checkers checking checkers."

95.     The Defendants knowingly suppressed discussions of SFR lending risk in meetings of the Executive Committee.   They treated the Chief Enterprise Risk Officer dismissively, excluding him from important meetings, and ultimately terminating him in May 2008.

96.     Other senior risk managers also clashed with the Defendants, particularly Rotella and Schneider, over their attempts to better manage the risks in WaMu's SFR lending.

97.     A few weeks before the Bank failed, its newest Chief Enterprise Risk Officer (who had assumed that position in May 2008), wrote a memorandum to Killinger laying bare WaMu's risk management shortcomings.   He observed that the Bank lacked the basic internal processes to make well-considered decisions in which the risks and benefits of each course of action were properly weighed.   Even at that late date, WaMu not only had serious deficiencies in its capacity to gather, report and analyze data needed to make good decisions, it lacked a culture that valued such an approach to decision-making.   He wrote:   "As a result, neither ERM nor other WaMu employees seem to have unifying principles to effectively reflect a risk

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 26

management perspective in important decisions or day-to-day activities."  As he put it, the Bank's "DNA" was missing "the risk chromosome."

98.     The Defendants' reckless execution of the Higher Risk Lending Strategy reflects these risk management deficiencies.  Given the obvious credit risks that the Bank was taking, a full discussion and careful consideration of risk was critical.  Instead, Defendants created and fostered a culture in which a risk management perspective was largely absent or ignored.

**B.     Defendants' Growth Strategy Depended on a Risk Management Infrastructure That They Knew Was Woefully Inadequate.**

99.     In addition to their lack of authority and marginalized status, risk managers were hampered by WaMu's poor infrastructure for monitoring and evaluating risks in the HFI portfolio in real time.  Though the Bank's risk managers worked hard to produce analytic reports on loan losses and other issues, the available data and analytics were relatively rudimentary given WaMu's lack of adequate technology.

100.     WaMu's technology and other infrastructure problems were evident to Defendants and others at the Bank.

101.     The Bank had grown dramatically through acquisitions starting in the 1990s, going from a regional thrift to one of the country's largest mortgage lenders, and as a result, had multiple loan origination platforms that were not coordinated.  By the mid-2000s, WaMu still had numerous separate platforms for its SFR lending, with largely manual rather than computerized processes.  This lack of integration made it extremely difficult for the Bank to closely track results and manage lending risks in its HFI portfolio, which was further exacerbated when WaMu cut staff in order to save costs.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTION RELIEF - 27

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

102. An outside consultant firm reported to the Bank in or about April 2007 that WaMu had numerous deficiencies in its ability to analyze loan data effectively so as to manage the risks within its HFI home loans portfolio.

103. The Defendants claimed to be "pricing for the risks" that WaMu was taking with its HFI home loans portfolio, but in fact the Bank could not accurately price for these risks.

104. In an email to Killinger dated August 23, 2007, Rotella acknowledged that WaMu had been hurt by a weak credit infrastructure and poor credit analytics, the same subject about which they had been warned in 2005:

> The big lesson here, which we are all painfully aware of now, is that without a strong credit organization and superb analytics in a bad credit cycle, decisions are too heavily based on what has happened versus what may. . . . [T]he lack of strong credit staff and analytics contributed to spotty underwriting discipline and a lack of insights into possible policy changes as we moved into HL [Home Loans] production.

105. Rotella further admitted in his August 23, 2007, email to Killinger that he "worried about our stated desire to take on more credit risk and the weak staff and infrastructure in ERM (center and business) if a credit downturn occurred."

106. Though some improvements eventually were made, it was far too little, too late. Even as of May 2008, one of the Home Loans Division's top analysts reported that the Bank was unable to "completely, accurately and efficiently capture, analyze, model and report on key risk and loss drivers across all asset classes."

**C. Defendants Failed to Follow Interagency Guidance on Option ARMs, HELOCs and Subprime Mortgage Products.**

107. As a further example of how the Defendants disregarded risk management to achieve sales volume, they failed to follow the Interagency Guidance on Nontraditional

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   Mortgage Products ("Guidance"), as well as various other interagency guidances regarding

2   sound lending practices for HELOCs and subprime loans.

3        108.   The Guidance, issued jointly by the FDIC and other federal agencies, addressed

4   Option ARMs and other nontraditional loans that "allow[ed] borrowers to defer payment of

5   principal and, sometimes, interest."  The Guidance provided information on managing the risks

6   of such products, which was highly relevant to a financial institution, like WaMu, which made

7

8   large volumes of such loans.

9        109.   The Guidance urged using many risk management practices that WaMu failed to

10  employ, such as avoiding risk layering, having reasonable geographic and product

11  concentration limits, maintaining tight controls, and closely monitoring lending activity.

12

13       110.   The Guidance warned that Option ARMs and other nontraditional loans should

14  be made based on the borrower's ability to repay the loan by final maturity at the fully indexed

15  rate, assuming a negatively amortizing payment schedule, rather than the ability of borrowers

16  to refinance the loan or sell the property.

17

18       111.   In December 2005, a draft of the Guidance was published for comment.

19       112.   On December 14, 2005, WaMu's regulatory liaison sent an email to Killinger,

20  Rotella and Schneider warning them that the Guidance reflected concerns about inappropriate

21  Option ARM lending and risk layering:

22

23            While the guidance will acknowledge that such products are
             appropriate for some consumers, the regulators will express
24            concern that these products are being sold to consumers for
             whom they are inappropriate and that risk layering in such
25            products with high LTVs, low FICOs, and relaxed Debt to
             Income standards (including lack of income verification) may
26            also be creating excessive risk.

27

28

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 29

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The regulatory liaison further emphasized that the Guidance would focus on the "need for banks offering these products to maintain an appropriately robust risk management capacity, especially since many of the layered structures now being offered haven't been tested in a sufficiently stressed economic environment." He also cautioned that the agencies will expect "a higher degree of sophistication from such banks in their management information and reporting systems to enable them to closely monitor risks associated with these products."

113.   In a December 2005 presentation that he authored in connection with the draft Guidance, Rotella identified most of the risk factors that later caused WaMu's excessive losses, including "high CLTV lending, higher DTIs, improper analysis or utilization of low underwriting rates, vs. likely rates the borrower will experience, low credit scores, low doc/no doc lending, third party originations, loans with large payment shock (extended no amortization periods and negative amortization loans), and markets with higher risk of excessive appreciation: TX, S. FL., S. CA, Vegas."

114.   Nonetheless, on March 29, 2006, Schneider wrote a letter to the Chief Counsel's Office at the Office of Thrift Supervision criticizing the draft Guidance as unduly limiting banks' discretion in selling Option ARM products. Schneider argued that banks should not assume the "worst-case scenario" by being required to underwrite these loans at the fully-indexed negatively-amortized rate (the rate that borrowers could have to pay after initially making minimal monthly payments). He also opposed setting concentration limits or requiring more controls over third-party brokers and correspondent lenders who sold these products to

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 30

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

WaMu, even while admitting that it was "virtually impossible for a lender to control the practices [and therefore the risks] of mortgage brokers or correspondent lenders."

115.    Schneider also argued in his March 29, 2006, letter that a borrower could always refinance out of a bad loan:  "If after a borrower takes an IO [interest only] or payment option loan, he or she realizes that this choice provides an uncomfortable level of uncertainty in payments, then the borrower will likely have options to refinance at a fixed rate to mitigate this risk."

116.    By March 29, 2006, Schneider and the other Defendants were well aware that there was a "housing bubble."  As they knew, many borrowers would be unable to refinance their Option ARM or interest-only loans if housing prices were to fall and their loans were negatively amortizing.

117.    When the final version of the Guidance was issued in October 2006, Schneider gave a presentation to WaMu's Board in which he concluded that it would have a "limited" impact on WaMu's Option ARM volume, noting that "[m]uch of the Guidance is open to interpretation" and regulators viewed the Guidance as "flexible."

118.    Later, after significant numbers of WaMu's Option ARM loans became delinquent or defaulted, Schneider admitted that the Bank – contrary to the Guidance – had relied on the ability of borrowers to refinance their adjustable rate loans.  In a November 2007 email to Killinger, Rotella, and others concerning loan workouts for borrowers in danger of default, Schneider admitted:

> None of these borrowers ever expected that they would have to pay at a rate greater than the start rate.  In fact, for the most part they were qualified at the start rate. . . .When we booked these

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 31

loans, we anticipated an average life of 2 years and never really anticipated the rate adjustments.

**III.    Killinger, Rotella and Schneider All Played Key Roles in the Failed Higher Risk Lending.**

119.    Each of the Defendants played a crucial role in the ill-fated Higher Risk Lending Strategy.  Killinger was the architect of the strategy and ultimately was responsible for its execution.  After their arrival at WaMu in 2005, Rotella and Schneider became the chief facilitators of that flawed strategy.  Rotella and Schneider aggressively pushed for a high volume of risky SFR lending, creating a home loans HFI portfolio layered with excessive risks, while stifling efforts to curb and better manage those risks.

**A.    Kerry K. Killinger**

120.    As an experienced banker with many years at WaMu, and the CEO of one of the largest financial institutions in the United States, Killinger knew or should have known the importance of credit risk management and that layering risks onto already high-risk loan products could lead to high losses or default rates.  He was specifically warned and acknowledged that, as WaMu greatly increased its credit risk pursuant to the Higher Risk Lending Strategy, robust risk management would be critical.

121.    Despite these warnings, Killinger was the main architect of the Higher Risk Lending Strategy.  He wrote the annual strategic memoranda from 2004 through 2007 that kept the Bank on its course of higher risk lending.  Despite repeated admissions that he foresaw a housing bubble in California and WaMu's other "footprint" states, Killinger continued to push growth of higher-margin products, such as Option ARMs, HELOCs and subprime loans, in

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 32

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

these same high-risk locations.  He also knew that these products were layered with the additional risks discussed above.

122.    Killinger also failed to make robust credit management a priority.  Instead, he created and implemented the five-year strategic plan that encouraged sales volume and short-term gains over prudent risk management and long-term soundness.  He expressly called for "significant risk taking" at the expense of risk management.  His wrongful conduct ultimately led to billions of dollars of losses.

**B.    Stephen J. Rotella**

123.    Killinger selected Rotella to become his strategic partner and to run the Bank's day-to-day operations as WaMu grew and implemented the Higher Risk Lending Strategy.

124.    Like Killinger, he was an experienced banker who knew or should have known the importance of credit risk management and that layering risks onto already high-risk loan products could lead to high losses or default rates.

125.    Rotella supported Killinger's push for growth through higher risk lending, and aggressively executed Killinger's plan to grow the Bank's HFI residential loan portfolio.

126.    Rotella repeatedly was warned of the risks of WaMu's Higher Risk Lending Strategy and the need for robust risk management, yet, according to numerous senior risk managers, he played a key role in stripping Enterprise Risk Management of its authority and marginalizing risk managers.

127.    As the person in charge of the day-to-day management of the Bank, and a member of the powerful Executive Committee that set the agenda for the Bank, Rotella had every opportunity to promote more prudent and diversified SFR lending supported by vigorous

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 33

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

risk management.  Instead, he chose to focus on short term profits by promoting loan volume, without ensuring that the Bank had the controls and infrastructure necessary to manage the higher risks that it was taking and that ultimately led to billions of dollars of losses.

**C.    David C. Schneider**

128.    Schneider was selected to become President of the Home Loans Division at a critical time, just as WaMu was implementing the Higher Risk Lending Strategy.

129.    Like Killinger and Rotella, he was an experienced banker who knew or should have known the importance of credit risk management and that layering risks onto already high-risk loan products could lead to high losses or default rates.

130.    Schneider supported Killinger's push for growth of higher risk lending, and aggressively executed Killinger's plan to grow the Bank's HFI residential mortgage portfolio.

131.    Schneider repeatedly was warned about the risks of WaMu's Higher Risk Lending Strategy and the need for robust risk management.  Yet, according to numerous senior risk managers, he worked with Rotella to strip ERM of its authority and marginalized risk managers.

132.    As the President of WaMu's Home Loans Division, Schneider was directly responsible for managing the Bank's SFR loans, including, but not limited to, its portfolio concentrations of Option ARMs, HELOCs and subprime loans (after the Bank acquired LBMC on March 1, 2006), and the appropriate geographic concentration of loans in high risk areas, such as California and Florida.

133.    Schneider also had responsibility for managing the risks of the Home Loans Division and attended numerous meetings with risk managers who warned him about those

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

risks. Schneider had every opportunity to promote more prudent and diversified SFR lending supported by vigorous risk management, but chose not to.

134.    Instead, Schneider used his own personal motto "be bold" to set the tone for managers and loan officers in the Home Loans Division, and encouraged them to maximize short term profits by promoting loan volume without ensuring that the Bank had the controls and infrastructure necessary to manage the higher risks that it was taking and that ultimately led to billions of dollars of losses.

135.    In Schneider's own words, he, Killinger, and Rotella were too concerned with "[m]arket share and growth focus at the expense of building solid infrastructure and controls."

IV.    **Defendants Caused WaMu's Held-for-Investment Residential Loan Portfolio To Be Layered With Multiple and Excessive Risks.**

136.    Defendants' unprecedented push for SFR loan volume resulted in an enormous HFI home loans portfolio layered with multiple risks.

A.    **Option ARMs/Negative Amortization.**

137.    Option adjustable rate mortgages ("Option ARMs") had been sold for years as a specialized product suitable for a select group of creditworthy borrowers. By 2005, however, WaMu sold them widely and indiscriminately, touting such loans as its "flagship" product. As of September 2008, Option ARMs totaled more than $51 billion and accounted for nearly half of WaMu's prime SFR portfolio.

138.    WaMu sold these products using low "teaser" rates and allowed borrowers to make "minimum" payments that not only failed to pay down the loan principal, but also did not cover the full interest accumulated on the loan. This so-called "negative amortization" resulted in unpaid interest being added to the loan principal and the borrower owing more than the

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 35

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1  original loan amount.  An Option ARM loan would "recast" at a higher interest rate and higher
2  monthly payment after the expiration of a specified period of time (*e.g.*, five years), or when
3  negative amortization resulted in the outstanding loan being a certain percentage above the
4  original principal amount (*e.g.*, 110% or 125%).
5

6      139.    The way in which the Option ARM products were designed and sold could lead
7  to "payment shock," where borrowers could not afford to pay the drastically increased
8  mortgage payment at the time of recast.  Payment shock created a significant risk of default,
9  which in turn could lead to losses for the lender.
10

11     140.    The percentage of negatively amortizing WaMu Option ARMs rose dramatically
12  from just 15% in February 2005 to more than 80% in 2007 and 2008.

13     141.    The Defendants repeatedly were warned of the risks of payment shock to
14  borrowers and that the Bank could suffer dramatic losses in its held for investment SFR
15  portfolio.  The Defendants ignored these warnings and instead counted on Option ARM
16  borrowers to refinance or sell their homes before or when payment shock occurred.  But if
17  housing prices declined, this often would not be a realistic option, as they well knew.
18

19     142.    The Defendants caused WaMu to originate or purchase and hold billions of
20  dollars in Option ARM loans during a housing bubble that they knew was likely to burst and
21  result in declining real estate prices.  Even after recognizing signs of a weakening housing
22  market, Defendants continued to cause WaMu to make and hold a large volume of Option
23  ARM loans.  WaMu originated approximately $42 billion in Option ARM loans in 2006, and
24  another approximately $24 billion in 2007.  At year-end 2006, there was $63.6 billion in Option
25

26
27
28

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 36

1    ARMs in the HFI portfolio, at year-end 2007 that figure was $58.9 billion, and on June 30,

2    2008, the figure was $52.9 billion.

3          143.    WaMu's Option ARM lending was geographically concentrated in areas where

4    the housing bubble was greatest, and involved other risk layers, including no or low

5    documentation and high loan-to–value ("LTV") and debt-to-income ("DTI") ratios.  By the

6    middle of 2008, approximately 50% of WaMu's Option ARM portfolio was secured by

7    California collateral; about 77% consisted of low documentation loans; about 14% had LTV

8    ratios that equaled or exceeded 90%; and about 19% had DTI ratios exceeding 46%, once loans

9    were recast.

10

11          144.    By September 2007, WaMu's Option ARM portfolio had become a main driver

12    of increases in early delinquencies and non-performing loans.  It was only then, in the Fall of

13    2007, that WaMu began to make major credit policy changes to curb the risks in the Option

14    ARM portfolio.  But much of the damage already had been done by this time.  WaMu finally

15    discontinued its Option ARM sales in June 2008 after negative amortization amounts had

16    snowballed to more than $2 billion.

17          **B.**      **Home Equity/High LTV Products.**

18          145.    WaMu added another significant layer of risk to its HFI home loan portfolio

19    through its routine approval of HELOCs and other "piggyback" mortgage products that greatly

20    increased borrowers' loan-to-value ratios and the consequent chance of default.  For example,

21    borrowers would obtain a loan for 80% of the price of the home, and get a HELOC to cover the

22    remaining 20%.

*Law Offices*
**K ARR  T UTTLE  C AMPBELL**
*A Professional Service Corporation*
**1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028**
**Telephone (206) 223-1313, Facsimile (206) 682-7100**

146.    These high LTV loans were particularly risky because they left little or no margin for error; even a slight downward correction in housing prices could put the loan "underwater," meaning that loan balance was greater than the home securing it.   Further, borrowers with high LTV loans had little or no money of their own invested in their home purchase, and thus they were much more likely to default when faced with financial difficulties.

147.    Once the number of HELOCs started to increase in 2005, it did not take long for the delinquencies to start rising.   A December 2006 Home Equity Risk Review reported a "sharp rise in non-performing loans during Q3 and Q4 2006."   HELOC net charge-offs increased dramatically from 2006 through 2008.

148.    As of the end of 2007, WaMu's concentration in HELOCs was 26% compared to the average of 8% across all FDIC-insured institutions.

149.    In or about April 2007, a national consultant retained by WaMu concluded that WaMu's HELOC "delinquency rates for '05-'06 vintages are substantially above industry rates" due to a "higher-risk mix of WaMu originations," "larger WaMu delinquent account balances relative to industry" and "more acute 'risk layering' effects," including "[p]oor performance in low FICO – high LTV combinations" and "concentration in poor HPA [home price appreciation] regions."

150.    When WaMu went into receivership in September 2008, HELOCs constituted about $53 billion, or approximately 30%, of the total $177 billion in the Bank's HFI residential loan portfolio.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 38

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**C.**     **Subprime.**

151.     As part of its Higher Risk Lending Strategy, WaMu originated and held for investment huge concentrations of subprime loans.  These were loans made to "higher-risk borrowers," i.e., borrowers with low FICO (credit) scores, delinquencies, charge-offs, judgments, and/or bankruptcies.

152.     The majority of WaMu's subprime originations were made through LBMC, which initially was acquired by WaMu's holding company, WMI, and merged into the Bank in March 2006, when it became part of the Home Loans Division.

153.     By March 2006, the Defendants already knew or should have known of very serious problems with subprime mortgages, including significant first payment and early payment defaults that resulted in growing losses.

154.     A June 2006 analysis remarked on the consequences of subprime risk-layering, noting that, "[t]he 30-day plus delinquency rate on loans combining FICOs less than 600, CLTVs greater than 80%, and stated income is . . . 17 times higher than loans without these attributes."   An additional layer of risk driving delinquencies was the increasingly risky products that were being sold, such as "hybrid" ARM products with initial fixed "teaser" rates that shifted to an adjustable rate after a predetermined period (e.g., 2/28, 3/27 products) and "interest only" loans.

155.     Defendants did attempt to impose certain positive changes to the subprime loans originated in 2006, but they failed to meaningfully mitigate the risks of the subprime loans in the HFI portfolio.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**D.**     **WaMu Layered Additional Risk Factors Into Its Already High-Risk Loans.**

156.     Defendants caused WaMu to compound the risk in its HFI home loans portfolio by adding layers of additional risk to already risky loans.

**Stated Income Loans.**

157.     WaMu added another dangerous layer of risk to its HFI home loans portfolio by dramatically expanding the availability of "stated income" loans (otherwise known as "low doc" or "no doc" loans) to virtually all types of borrowers, rather than just borrowers who were self-employed or who had excellent credit, as had previously been the norm.

158.     A loan is based on "stated income" where the Bank relies on the borrower's representation as to his or her income.  The inherent risk with a stated income loan is obvious: the borrower may exaggerate or inflate "income" to enhance the prospects of obtaining a loan for which the borrower is not really qualified.  For this reason, stated income loans were commonly known as "liar's loans."

159.     WaMu offered stated income loans to borrowers merely if they "prefer[] the processing convenience."

160.     Stated income loans comprised a large share of WaMu's loans that resulted in losses, particularly in the Option ARM portfolio.

**Geographic Concentration.**

161.     At the Defendants' direction, WaMu further layered its risks by deliberately focusing its SFR lending in "footprint" states, such as California and Florida, where it already had a retail presence.  WaMu's narrow focus on these housing "boom" areas significantly increased the losses in its HFI home loans portfolio when the housing bubble burst in 2007.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 40

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

162.    Between the fourth quarter of 2005 and the time the Bank failed in September 2008, California loans comprised nearly 50% of WaMu's total SFR loan portfolio, concentrated mostly in large urban areas.  In addition, between 70% and 80% of WaMu's SFR loans during this time frame were made in California, Florida, New York, Washington, Texas and Illinois.  Many of WaMu's high risk products were sold in these geographically concentrated areas.  For instance, as of April 2008, 33% of all home equity loans were sold in just four urban areas in California, and about 63% of all Option ARMs were located in California and Florida.

163.    WaMu's geographic concentration was dramatically greater than the industry as a whole.  At a July 17, 2007, internal WaMu meeting, Schneider acknowledged that WaMu's charge-offs were above the industry's highs due to its concentration in California.  WaMu's Chief Financial Officer likewise acknowledged at an August 14, 2008, internal meeting that WaMu's performance was "generally worse" than other financial institutions "due to the concentration in the California market which has been particularly hard hit by housing price depreciation."

164.    In his final Strategic Direction memorandum in June 2008, Killinger also conceded that WaMu took on too much geographic concentration risk.

**Weak Underwriting.**

165.    As Defendants knew or should have known, many of WaMu's held for investment SFR loans were the product of weak, undisciplined underwriting practices, creating a significant additional layer of risk.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 41

**Compensation Incentives for Loan Officers and Underwriters.**

166.    WaMu's compensation structure for loan officers was based on the volume of loans originated, and thus loan originators were incentivized to push as many loans through the system as possible, creating additional risk to WaMu.

167.    For instance, WaMu's 2006 compensation plan for loan originators stated: "Rewards will be based on the dollar volume of loans funded each month." WaMu's compensation policy for underwriters similarly created strong incentives to increase the volume of loans.

168.    In a June 19, 2006 memorandum, Schneider explained that management had "[i]mplemented a new profit driven compensation and support staff model in our Retail Channel to support larger volume producers and those who focus on attractive products."

**Executive Compensation Incentives.**

169.    WaMu's approach to executive compensation also promoted loan volume over quality by heavily emphasizing performance-based pay based on short-term results.

170.    Compensation for senior executives was composed of various elements, including base salary, cash bonuses, performance share awards, equity-based awards of restricted stock, and stock options. Bonuses were based in large part on earnings per share as well as revenue, thus creating a strong incentive for the Defendants and other executives to pursue short-term profits.

**Weak Fraud Prevention Controls.**

171.    WaMu's eagerness to make loans and its risky lending practices also made WaMu more vulnerable to fraud, thereby increasing WaMu's losses. Between 2005 and 2008,

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 42

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1    WaMu suffered rising fraud losses in residential mortgages and home equity, totaling hundreds

2    of millions of dollars.

3        172.    A February 14, 2006, memorandum from the Chief Enterprise Risk Officer

4    reported that "[a] major concern" of the internal WaMu Fraud Steering Committee "is the

5    inadequacy of WaMu's fraud tools compared to the industry."

6        173.    Fraud management was placed in the business lines, and there was no Board-

7    approved fraud risk management policy that established the framework and delegated

8    responsibility and authority for the development and oversight of this area to a particular group.

9        **Other Risk Layers.**

10       174.    WaMu also added other risk layers into its held for investment SFR portfolio,

11   including, but not limited to:

12           a.    Loans with high debt-to-income (DTI) ratios, which meant that

13                 borrowers had less income to repay the loans over the long term;

14           b.    Non-owner occupied loans to speculators and second home buyers, who

15                 often lacked an incentive to repay their mortgages or HELOCs when

16                 home values decreased;

17           c.    Interest-only loans, which did not require that any principal be repaid for

18                 a significant period of time;

19           d.    2/28 and 3/27 hybrid ARM loans, which offered low initial teaser rates

20                 to subprime borrowers who would not otherwise have qualified for such

21                 a loan on a fully-amortized basis;

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 43

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

e.    "Cash out" refinancings, where borrowers were able to walk away from the closing with cash, leaving little equity in the property; and

f.    Loans originated by third-party brokers, correspondents and conduit channels, over whom WaMu exercised poor quality controls and which often used their own poor underwriting standards.

## V.    The Defendants' Excessive Risk Taking and Disregard for Risk Management Caused Enormous Losses to WaMu.

175.    By encouraging, sanctioning, and causing WaMu to accumulate a large volume of multi-risk layered SFR loans in its HFI portfolio and failing to implement appropriate risk management or heed repeated warnings from risk managers in their push for loan volume and short-term gain, Killinger, Rotella and Schneider caused the Bank to incur material loss.

176.    Among other things, the Defendants' emphasis on the Bank's origination or acquisition of higher risk products, their failure to address obvious infrastructure and control limitations, their strategy of concentrating loan production in overheated geographic markets, and their efforts to build market share by abandoning prudent lending practices and layering multiple risks on top of already high-risk loan products during an acknowledged "housing bubble," resulted in an HFI residential mortgage and HELOC portfolio that was destined to sustain enormous losses.

177.    As a direct and foreseeable consequence of the Defendants' mismanagement, WaMu's held for investment SFR portfolio experienced extremely high delinquencies and charge-offs and incurred losses that could not be offset through the higher "pricing" that WaMu purportedly was obtaining on its high risk loans.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 44

178.    As a result of the Higher Risk Lending Strategy, WaMu suffered extraordinary losses on Option ARM, HELOC and subprime loans in its HFI portfolio.  For instance, on such loans originated after September 2005, the Bank incurred roughly $4.2 billion of net charge-offs prior to its closing in September 2008.  Further, as of September 2008, WaMu had recorded an allowance for loan losses associated with these loans (i.e., the additional future loss the Bank's accounting staff and management estimated the Bank would suffer on these loans) of approximately $3.2 billion.  Contemporaneous internal reports prepared by the Bank's credit risk management team and outside consultants put the expected losses even higher, estimating eventual write-offs of at least one-and-one-half to two times the allowance amount.  These estimates later were dwarfed by the $31 billion write-down from face value recorded by the purchaser of WaMu's home loan portfolios after the Bank went into receivership.

179.    On just the Option ARM, HELOC and subprime loans that displayed multiple risk factors (e.g., loans with low FICO scores, high LTVs and DTIs, and low documentation requirements), the Bank suffered billions of dollars in losses despite the purportedly higher interest earned from these higher risk loans.

180.    Had the Defendants fulfilled the duties they owed to WaMu and acted with the requisite level of care, the Bank would not have had a large volume of multi-risk layered loans in its HFI portfolio.  Defendants' conduct caused the Bank to lose billions of dollars on these high-risk loans.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**CLAIMS FOR RELIEF**

**COUNT I**
**GROSS NEGLIGENCE**

***(Against Kerry K. Killinger, Stephen J. Rotella and David C. Schneider)***

181.    The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 180 as if fully set out in this count.

182.    During the relevant times, Killinger, Rotella and Schneider were officers of WaMu.  Killinger also was a director of WaMu until June 2008.

183.    Section 1821(k) of FIRREA holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Gross negligence does not mean the "total absence of care," but it is "negligence substantially and appreciably greater than ordinary negligence."

184.    As officers and/or directors, Killinger, Rotella and Schneider owed WaMu a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care, included, but was not limited to, the following:

a.    To adopt such careful, reasonable and prudent policies and procedures, including those related to lending and underwriting, as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures;

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 46

*Law Offices*
K A R R   T U T T L E   C A M P B E L L
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

b.    To communicate to the Bank's loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit procedures by establishing a system of checks and balances and by careful monitoring of loan officers' conduct;

c.    To require that sufficiently detailed, current and reliable information be provided upon which they could make prudent decisions, including the use of current technology and internal control procedures to timely identify problems and allow for early remediation;

d.    To support and foster WaMu's internal risk management functions, and ensure adequate funding for these functions for a Bank of WaMu's size and assets;

e.    To develop contingency plans and take other proactive steps to limit or prevent significant financial losses in the held-for-investment single family residential home loans portfolio;

f.    To consider and adopt reasonable recommendations from employees of WaMu's Enterprise Risk Management department for controlling the Bank's lending risks;

g.    To timely acknowledge and adequately respond to changes in economic conditions that create additional risk with respect to certain types of products or transactions;

h.    To enforce policies and procedures designed to ensure that loans would not be made based on inadequate or inaccurate information;

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 47

i.     Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed;

j.     To carefully review reports of examinations and other directives of regulatory agencies, to carry out the instructions and orders contained in those reports, to investigate and cure problems noted therein, and to prevent any repetition of such problems and deficiencies; and

k.     To conduct WaMu's business in compliance with all applicable state and federal laws and regulations.

185.    Killinger, Rotella and Schneider, through their gross negligence, breached their duties of care by, among other things, acting with reckless disregard for or failing to exercise slight care in:

a.     Adopting and/or implementing unreasonable and imprudent lending and underwriting policies and procedures that amounted to unsafe and unsound banking practices with respect to loans in the Bank's held for investment SFR portfolio;

b.     Causing the Bank to make home loans with little or no regard for borrowers' ability to repay them;

c.     Developing home lending policies and procedures that improperly relied on the continued sustainability of increasing home prices despite acknowledging the existence of a "housing bubble";

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 48

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

d.     Creating a held-for-investment home loans portfolio with multiple layers of risk, without establishing adequate risk management limits and monitoring processes to account for those risks;

e.     Failing to establish adequate limits on the Bank's concentration of Option ARMs and Alt A products, and failing to monitor and account for the consequent risks of negative amortization and payment shock to borrowers;

f.     Failing to establish adequate limits on the Bank's concentration of products with high loan-to-value ratios, such as second lien HELOCs, and failing to monitor and account for the consequent risk of default;

g.     Failing to establish adequate limits on the Bank's concentration of home loans to subprime borrowers, non-creditworthy borrowers and those in great financial difficulty, and failing to monitor and account for the consequent risk of default;

h.     Failing to establish adequate limits on geographic concentrations of loans, especially in California and Florida, and failing to protect against substantial losses to the Bank from a depreciation in housing prices in those areas;

i.     Establishing executive compensation and employee compensation programs that encouraged high loan volume at the expense of loan quality instead of creating an atmosphere that encouraged sound lending practices and good credit procedures;

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 49

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

j.  Encouraging stated income and stated asset lending despite the clear risks that this practice would lead to inaccurate or fraudulent loan applications and supporting documents;

k.  Failing to adopt the reasonable recommendations of WaMu's Enterprise Risk Management personnel for controlling the Bank's home lending and underwriting risks;

l.  Failing to ensure that an adequate risk management structure and risk contingency plans were in place for implementing the Bank's Higher Risk Lending Strategy;

m.  Failing to invest in updated technology and staffing necessary to track, analyze and reliably report loan data; timely identify problems and external market changes to allow for early remediation; and protect the Bank against mortgage and HELOC fraud;

n.  Failing to develop adequate contingency or exit plans to meet changing market conditions; and

o.  Failing to take action to prevent the re-occurrence of any unsafe or unsound banking practice that came to their attention, including, but not limited to, multiple and repeated warnings from Enterprise Risk Management personnel about the various deficiencies noted above.

186.  As a direct and proximate result of Defendants' gross negligence, the FDIC, as Receiver for WaMu, suffered damages in an amount to be proven at trial.

COMPLAINT FOR GROSS NEGLIGENCE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, FRAUDULENT CONVEYANCE AND INJUNCTIVE RELIEF - 50

## COUNT II
## ORDINARY NEGLIGENCE

*(Against Kerry K. Killinger, Stephen J. Rotella and David C. Schneider)*

187.    The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 186 as if fully set out in this count.

188.    During the relevant times, Killinger, Rotella and Schneider were officers of WaMu.  Killinger also was a director of WaMu until June 2008.

189.    As officers and/or directors, Killinger, Rotella and Schneider owed WaMu a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care, included, but was not limited to, the matters set forth in subparagraphs 184.a - k above.

190.    Killinger, Rotella and Schneider breached their duties and were negligent by, among other things, the acts, errors and omissions set forth in subparagraphs 185.a - o above.

191.    As a direct and proximate result of Defendants' negligence, the FDIC, as Receiver for WaMu, suffered damages in an amount to be proven at trial.

## COUNT III
## BREACH OF FIDUCIARY DUTY

*(Against Kerry K. Killinger, Stephen J. Rotella and David C. Schneider)*

192.    The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 191 as if fully set out in this count.

193.    During the relevant times, Killinger, Rotella and Schneider were officers of WaMu.  Killinger also was a director of WaMu until June 2008.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 51

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

194.     As officers and/or directors, Defendants owed fiduciary duties to WaMu, including, but not limited to, the matters set forth in subparagraphs 184.a - k above.

195.     Defendants breached those fiduciary duties by, among other things, the acts, errors and omissions set forth in subparagraphs 185.a - o above.

196.     As a direct and proximate result of Defendants' breaches of fiduciary duties, the FDIC, as Receiver for WaMu, suffered damages in an amount to be proven at trial.

## COUNT IV
## FRAUDULENT CONVEYANCE

### Washington Uniform Fraudulent Transfer Act, RCW § 19.40.041

*(Against Kerry K. Killinger and Linda Killinger)*

197.     The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 196 as if fully set out in this count.

198.     In or about August 2008, Kerry Killinger and his wife, Linda Killinger, transferred their residence in Palm Desert, California, to two irrevocable qualified personal residence trusts ("QPRTs") named the "KK QPRT I 2008 Trust" (which appointed Kerry Killinger as trustee) and the "LCK QPRT I 2008 Trust" (which appointed Linda Killinger as trustee).

199.     In or about August 2008, Kerry Killinger transferred an undivided one-half interest in his residence in Shoreline, Washington, to his wife, Linda Killinger.   Shortly thereafter, Kerry Killinger and Linda Killinger each transferred their respective undivided one-half interests in this residence to two irrevocable QPRTs named the "KK QPRT II 2008 Trust" (which appointed Kerry Killinger as trustee) and the "LCK QPRT II 2008 Trust" (which appointed Linda Killinger as trustee).

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 52

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

200.    Each of these property transfers was made with actual intent to hinder, delay or defraud Kerry Killinger's present and future creditors.  Among other things:

a.    Kerry Killinger had been personally named as a defendant in numerous lawsuits at the time of these transfers, which posed a potential exposure far in excess of his means;

b.    He had been removed from his position as WaMu's Chairman of the Board in June 2008 due to the substantial losses the Bank incurred while under his control;

c.    In July 2008, a "run on the bank" of approximately $9 billion placed a significant strain on WaMu's liquidity and continued viability;

d.    Kerry Killinger's property transfers were made to his spouse and to trusts controlled by himself and his spouse as trustees;

e.    He and his spouse retained possession of the residences after the transfers and continued to live in and use them; and

f.    On information and belief, the transfers were not disclosed to or were concealed from his present and future creditors.

201.    Alternatively, each of these property transfers was made without receiving a reasonably equivalent value in exchange, and Kerry Killinger believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.  Among other things, Kerry Killinger had been personally named as a defendant in numerous lawsuits at the time of these transfers, which posed a potential exposure far in excess of his means.

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 53

202.    Each of these property transfers constitutes a fraudulent conveyance for purposes of Revised Code of Washington § 19.40.041.

### COUNT V
### FRAUDULENT CONVEYANCE

### Washington Uniform Fraudulent Transfer Act, RCW § 19.40.041

### *(Against Stephen J. Rotella and Esther Rotella)*

203.    The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 196 as if fully set out in this count.

204.    In or about March or April 2008, Stephen Rotella and his wife, Esther Rotella, transferred their residence in Orient, New York, to two irrevocable QPRTs dated March 14, 2008, named the "Stephen J. Rotella QPRT 2008 Trust" (which appointed Stephen Rotella as trustee) and the "Esther T. Rotella QPRT 2008 Trust" (which appointed Esther Rotella as trustee).

205.    On information and belief, Stephen Rotella transferred in excess of one million dollars to Esther Rotella after WaMu failed in September 2008.

206.    Each of these transfers was made with actual intent to hinder, delay or defraud Stephen Rotella's present and future creditors.  Among other things:

a.    Stephen Rotella had been personally named as a defendant in numerous lawsuits at the time of these transfers, which posed a potential exposure far in excess of his means;

b.    The monetary transfers to Esther Rotella were made after WaMu already had failed and been placed into receivership in September 2008;

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 54

c.  The transfers were made to his spouse and to trusts controlled by himself and his spouse as trustees;

d.  He and his spouse retained possession of the New York residence after the property transfer and continued to live in and use it; and

e.  On information and belief, the transfers were not disclosed to or were concealed from his present and future creditors.

207.  Alternatively, each of these transfers was made without receiving a reasonably equivalent value in exchange, and Stephen Rotella believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.  Among other things, Stephen Rotella had been personally named as a defendant in numerous lawsuits at the time of these transfers, which posed a potential exposure far in excess of his means.

208.  Each of these transfers of money and property constitutes a fraudulent conveyance for purposes of Revised Code of Washington § 19.40.041.

<u>**COUNT VI**</u>
<u>**ASSET FREEZE**</u>

<u>**12 U.S.C. § 1821(d)(18)-(19)**</u>

*(Against Kerry K. Killinger, Linda Killinger, Stephen J. Rotella and Esther Rotella)*

209.  The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 208 as if fully set out in this count.

210.  Pursuant to 12 U.S.C. § 1821(d)(18), the Court may, at the request of the FDIC, "issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure, including

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

an order placing the assets of any person designated by the [FDIC] under the control of the court and appointing a trustee to hold such assets."

211.    Pursuant to 12 U.S.C. § 1821(d)(19), the FDIC may obtain preliminary injunctive relief under Federal Rule of Civil Procedure 65 "without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate."

212.    The FDIC is entitled to equitable and injunctive relief against Kerry Killinger, Linda Killinger, Stephen Rotella and Esther Rotella pursuant to 12 U.S.C. § 1821(d)(18) & (19) and Federal Rule of Civil Procedure 65, including, among other things, a preliminary injunction:

a.    Freezing the fraudulently transferred assets described in Counts IV and V above, including, but not limited to, the QPRTs discussed above; and

b.    Requiring Kerry Killinger and Stephen Rotella to provide 30 days advance notice to the FDIC, during the pendency of this litigation and any subsequent judgment in favor of FDIC, of any intended future transfers of their remaining assets in the amount of $10,000 or more in a single transaction.

213.    The FDIC is likely to succeed on the merits of its claims against Kerry Killinger and Stephen Rotella for gross negligence, ordinary negligence, and breach of fiduciary duty and on its fraudulent transfer claims against Kerry and Linda Killinger and Stephen and Esther Rotella.

214.    Given the Killingers' and the Rotellas' prior efforts to fraudulently convey their assets to avoid the reach of creditors, and the fact that their assets are substantially insufficient

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 56

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1  to satisfy the damages claimed in this Complaint, a possibility exists that the FDIC would

2  suffer imminent harm if the requested injunctive relief is denied.

3  215.    To the extent that the balance of hardships is weighed in this matter, the

4  Killingers and Rotellas will not suffer substantial harm if the FDIC's request is granted, given

5

6  the limited nature of the injunctive relief requested in this count.   Thus, the balance of

7  hardships weighs in the FDIC's favor.

8  ### REQUEST FOR RELIEF

9  WHEREFORE, the Federal Deposit Insurance Corporation, as Receiver of Washington

10  Mutual Bank, demands a trial by jury and a judgment in its favor and against Kerry K.

11

12  Killinger, Stephen J. Rotella, David Schneider, Linda Killinger, and Esther Rotella, as follows:

13  ### Counts I, II and III

14  ***(Against Kerry K. Killinger, Stephen J. Rotella and David Schneider)***

15

16  A.    An award of damages in an amount to be established at trial;

17  B.    An award of prejudgment interest on such damages;

18  C.    An award of costs and other expenses recoverable in connection with

19

20  this proceeding; and

21  D.    Such other and further relief as the Court may deem just, equitable or

22  proper.

23

24

25

26

27

28

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 57

## Counts IV and V

*(Against Kerry K. Killinger, Linda Killinger,*
*Stephen J. Rotella and Esther Rotella)*

A.   A judgment setting aside and voiding each of the fraudulent transfers and directing that such assets be made available to the FDIC for satisfaction of any judgment that will be rendered in this action;

B.   Alternatively, a money judgment equal to the value of each property at the time of the fraudulent transfer;

C.   An order restraining Kerry K. Killinger, Stephen J. Rotella, Linda Killinger, and Esther Rotella from disposing of the fraudulently transferred property and assets during the pendency of this litigation and after a judgment has been rendered in the FDIC's favor; and

D.   An order granting such other equitable relief as may be justified under the circumstances.

## Count V

*(Against Kerry K. Killinger, Linda Killinger,*
*Stephen J. Rotella and Esther Rotella)*

An order granting a preliminary and/or permanent injunction:

A.   Freezing Kerry K. Killinger, Stephen J. Rotella, Linda Killinger, and Esther Rotella's fraudulently transferred assets, including the QPRTs discussed above;

B.   Requiring Kerry Killinger and Stephen Rotella to provide 30 days advance notice to the FDIC, during the pendency of this litigation and

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 58

1    any subsequent judgment in favor of FDIC, of any intended future

2    transfers of their remaining assets in the amount of $10,000 or more in a

3    single transaction; and

4     C.     Granting such other equitable relief as may be justified under the

5    circumstances.

7    DATED this 16th day of March, 2011.

s/Bruce E. Larson
Bruce E. Larson, State Bar No. 6209
Walter E. Barton, State Bar No. 26408
Dennis H. Walters, State Bar No. 9444
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, WA 98101
(206) 223-1313
blarson@karrtuttle.com
gbarton@karrtuttle.com
dwalters@karrtuttle.com
Attorneys for the Federal Deposit Insurance
Corporation, as Receiver of Washington Mutual
Bank

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Reed Smith LLP**
10 South Wacker Drive
Suite 4000
Chicago, IL 60606
(312) 207-1000

Barry S. Rosen
    Ill. Bar No. 2380595
    Pro Hac Vice Application Pending
    brosen@reedsmith.com
Duane F. Sigelko
    Ill. Bar No. 6193434
    Pro Hac Vice Application Pending
    dsigelko@reedsmith.com
Mark S. Hersh
    Ill. Bar No. 6185487
    Pro Hac Vice Application Pending
    mhersh@reedsmith.com
Henry Pietrkowski
    Ill. Bar No. 6230048
    Pro Hac Vice Application Pending
    hpietrkowski@reedsmith.com
James A. Rolfes
    Ill. Bar No. 6200271
    Pro Hac Vice Application Pending
    jrolfes@reedsmith.com

**Federal Deposit Insurance Corporation**
Leonard J. DePasquale, Counsel – Legal Division
    R.I. Bar No. 4753
    Pro Hac Vice Application Pending
    Ldepasquale@FDIC.gov
    3501 North Fairfax Drive, VS-B-7058
    Arlington, VA 22226
    (703) 562-2063

COMPLAINT FOR GROSS NEGLIGENCE,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY,
FRAUDULENT CONVEYANCE AND
INJUNCTIVE RELIEF - 60

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100